IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALFA LAVAL, INC. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-CV-840 |
| KINETICS GROUP, INC., ET AL. | : | |

J. SURRICK                                                                                                  MARCH 14, 2007

## MEMORANDUM & ORDER

Presently before the Court is Plaintiff's Motion For Summary Judgment (Doc. No. 41). For the following reasons, the Motion is Denied.

I.   BACKGROUND

Plaintiff Alfa Laval, Inc. and Defendants Kinetics Group, Inc., Kinetics Systems, Inc. and Celerity Group, Inc. (collectively "Defendants"), are both in the business of providing integrated design and modular manufacturing of biotechnology process equipment and modules, and selling products related thereto. In October 2003, Plaintiff agreed to purchase all of the shares of Defendants' subsidiary, BioKinetics, for $29,900,000. (Doc. No. 41 at 1.) Plaintiff claims that a few months after this deal closed, it discovered wholesale fraud reflected in the books and records of BioKinetics's operation, rendering the company virtually worthless. (*Id.*) On March 14, 2004, Plaintiff sued Defendants for securities fraud in connection with its purchase of BioKinetics. (*Id.*) The parties entered into settlement negotiations, eventually reaching an agreement. *See Alfa Laval Inc. v. Kinetics Group, Inc.*, No. 04-1205 (E.D. Pa. Oct. 7, 2004) (J. Pollack). Plaintiff and Defendants signed a Settlement Agreement that included several agreements. Defendants agreed to pay Plaintiff an initial cash payment of $7,091,416.00.

Defendants also entered into ancillary agreements that provided for, among other things, a series of payments over time. (*Id.* at 2.)

The first of these agreements was an amendment to the parties' original Separation and Transition Services Agreement (the "First Amendment Agreement"), which was signed by the parties in 2003. (*Id.*) The 2003 agreement had prohibited Defendants from competing in the biokinetics industry anywhere in North America for a period of two years after the closing date. (*Id.* at 3.) The First Amendment Agreement reiterated the terms of the original Separation and Transition Services Agreement but extended its scope worldwide. (*Id.*)

The second agreement was the Supply Agreement. Under the Supply Agreement, Defendants agreed to purchase $15,000,000 worth of products from Plaintiff between 2005 and 2007 according to the following schedule: (1) $3,000,000 worth of products between June 30, 2004 and June 30, 2005 ("Year One"), (2) $4,500,000 worth of products between July 1, 2005 and June 30, 2006 ("Year Two"), and (3) $7,500,000 worth of Products between July 1, 2006 and June 30, 2007 ("Year Three"). (*Id.* at Ex. F.) In the event that the aggregate amount of the products purchased by Defendants was less than the required amount under the Supply Agreement in any given year, Defendants agreed to pay Plaintiff a lump sum equal to 15% of the difference between the required amount and the amount purchased for that year. (*Id.*) Defendants were required to pay this Make-Whole amount no more than thirty days following the end of the applicable year or within thirty days of an invoice from Plaintiff, whichever occurred later. (*Id.*)

The third agreement was the Engineering Services Agreement. Under this Agreement, Defendants agreed to purchase a minimum of $5,000,000 worth of services between 2005 and

2006 according to the following schedule: (1) $1,750,000 worth of services between June 29, 2004 and June 30, 2005 ("Year One"), and (2) $3,250,000 worth of services between July 1, 2005 and June 30, 2006 ("Year Two"). (*Id.* at Ex. G.) In the event that the aggregate value of all services purchased was less than the amount required under the Agreement, Defendants agreed to pay Plaintiff a lump sum equal to 20% of the difference between the required amount and the amount purchased. (*Id.*)

According to Plaintiff, Defendants realized shortly after signing the Settlement Agreement that they were unable to meet their obligations under both the Supply Agreement and the Engineering Services Agreement. (Doc. No. 41 at 3.) At that point, successive Chief Executive officers of Defendants wrote to Plaintiff, asking it to terminate the non-compete clause and allow Defendants to compete against it for design/build projects. (*See id.* at Exs. J and K.) Defendants also sought to extend the deadline for the required purchases under both the Supply and Engineering Services Agreements. (*Id.*) Plaintiff did not agree to these modifications, and the Agreements remained in full force as originally worded.

Plaintiff then filed this lawsuit, alleging the following claims against Defendants: (1) Breach of the Supply Agreement for failure to make the requisite purchases or comply with the Make-Whole provisions; (2) Breach of the Engineering Services Agreement for failure to make the requisite purchases or comply with the Make-Whole provisions; and (3) Breach of the Settlement Agreement for failing to comply with the Supply Agreement and Engineering Services Agreement. (Doc. No. 1.) Finally, Plaintiff seeks a Declaratory Judgment under 28 U.S.C. § 2201, terminating the Supply and Engineering Services Agreements because Defendants breached the implied covenant of good faith and fair dealing. Plaintiff requests that

we order Defendants to pay the shortfall amounts owed under both Agreements and award it all costs incurred in bringing this action. (*Id.*)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "The nonmoving party . . . 'cannot rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim." *Townes v. City of Phila.,* Civ. A. No. 00-CV-138, 2001 U.S. Dist. LEXIS 6056, at *4 (E.D. Pa. May 11, 2001) (quoting *Fireman's Ins. Co. v. DeFresne,* 676 F.2d 965, 969 (3d Cir. 1982)).  Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial.

*Celotex,* 477 U.S. at 324.  When deciding a motion for summary judgment, the court must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir. 1995).  However, we will not resolve factual disputes or make credibility determinations.  *Siegel Transfer, Inc.,* 54 F.3d at 1127.[1]

### III.   LEGAL ANALYSIS

Plaintiff claims it is entitled to summary judgment because there is no genuine issue of material fact as to Defendants' breach of the Supply Agreement, the Engineering Services Agreement, or the implied covenant of good faith and fair dealing.  Defendants disagree.

#### A.   The Supply Agreement

Plaintiff claims that Defendants breached the Supply Agreement both by failing to purchase the required amount of products, and by failing to comply with the Make-Whole provisions in all three years of the Agreement.

Plaintiff initially alleged that Defendants breached Years One and Two of the Supply Agreement by failing to make the requisite purchases or complying with the Make-Whole provisions in those years.  Plaintiff now agrees that after it filed this lawsuit, Defendants paid it the proper amounts owed for the Make-Whole payments for those years.  Plaintiff now requests that the Court award it interest and attorneys fees because Defendants' payments were late and in bad faith.  Defendants readily admit that their Make-Whole payments for Years One and Two of the Supply Agreement were late, but claim that this was the result of a bona fide dispute over the

---

[1] The Agreements at issue here provide for the application of Delaware law.  (Doc. No. 41 at Ex. F, § 10(b).)

amount of the total number of products it purchased in those years, and not an act of bad faith. (Doc. No. 42 at 6.)  To support this contention, Defendants point out that they made an initial Make-Whole payment of $820,361.03 to Plaintiff for Years One and Two while they awaited further information from Plaintiff regarding their total purchases, and that they made an additional payment of $117,211.32 once the parties resolved their dispute.  (*Id.*)  Based upon the present record, it appears that Defendants' dispute over its total number of purchases, and its impact on their payment requirements under the Make-Whole provisions creates a genuine issue of material fact.  Accordingly, Plaintiff's Motion for Summary Judgment as to Defendants breach of Years One and Two of the Supply Agreement will be denied.

Plaintiff next alleges that Defendants are in breach of their Year Three obligations under the Supply Agreement because they have not made any purchases this year from Plaintiff.  Under the Agreement, Defendants have until June 30, 2007 to make their Year Three purchases from Plaintiff and its authorized resellers.  Should Defendants fail to make these purchases, they can still comply with the Make-Whole provision for Year Three.  Defendants admit they have not made any purchases from Plaintiff in Year Three thus far.  However, they assert that they have made several purchases from Plaintiff's authorized resellers and that they may still fall back on the Make-Whole provision.  Again, based upon the record as it now stands, we will not declare that Defendants are in breach of their Year Three obligations.  Plaintiff's request that we terminate the Supply Agreement and award them expectation damages for Year Three will be denied at this juncture.

      B.    **Engineering Services Agreement**

Plaintiff further claims that Defendants have breached the Engineering Services

Agreement by failing to comply with the Make-Whole amounts for Years One and Two. The parties agree that Defendants purchased $545,362.14 worth of engineering services in the two years of the Agreement, leaving a shortfall of $4,454,637.86 from the agreed purchase minimum of $5 million. Defendants concede that they made no payments under the Make-Whole provision for either year of this Agreement, but raise a defense of commercial frustration.

     Specifically, Defendants allege that when they entered into the Engineering Services Agreement, BioKinetics, formerly a unit of Defendants, was actively engaged in the business of integrated design and modular manufacturing of custom biotechnology process equipment and modules intended for use in bio-pharmaceutical facilities, the exact services Defendants were required to purchase from Plaintiff. In March 2005, nine months after the Engineering Services Agreement was signed, Plaintiff announced that it was closing down its Ontario facility and was getting out of the active business of integrated design and production of custom biopharmaceutical modules. Defendants claim that although Plaintiff stated that it could continue to provide these services, they would do so through yet to be identified subcontractors who were not a party to the Engineering Services Agreement. Defendants argument here is two-fold. They claim that Plaintiff's closure of the Ontario factory severely impacted their ability to purchase engineering services from Plaintiff, and even if Plaintiff's subcontractors could provide these services, they were not contractually required to accept such services from third-parties because the Agreement contained a non-assignment clause prohibiting such actions. Defendants argue that Plaintiff may not interfere with Defendants' ability to perform under the contract and then seek to benefit from its own interference. Defendants argument is interesting considering the alleged reasons for the original lawsuit. In any event, there appear to be genuine issues of

material fact to be resolved.  Accordingly, Plaintiff's Motion for Summary Judgment as to Defendants breach of the Engineering Services Agreement will be denied.

### C.     Covenant of Good Faith and Fair Dealing

Finally, Plaintiff asks us to issue a declaratory judgment terminating both the Supply Agreement and the Engineering Services Agreement because Defendants breached the implied duty of good faith and fair dealing that accompanies every contract governed by Delaware law. Whether Defendants have breached their duty of good faith and fair dealing can be determined only after a consideration of the facts presented at trial.  Defendants have raised issues of fact concerning the impact of both the closing of Plaintiff's Ontario facility and the impact of the non-assignment clause on their duty to perform under the Engineering Services Agreement.  For these reasons, Plaintiff's Motion for Summary Judgment as to this claim will be denied.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALFA LAVAL, INC. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-CV-840 |
| KINETICS GROUP, INC., ET AL. | : | |

**<u>ORDER</u>**

AND NOW, this  14th  day of March, 2007, upon consideration of Plaintiff's Motion For Summary Judgment (Doc. No. 41), and all papers submitted in support thereof and in opposition thereto, it is ORDERED that the Motion is DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge